IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Charles Cox, | ) | C/A No.: 1:15-cv-04608-JMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **PLAINTIFF'S RESPONSE IN** |
| | ) | **OPPOSITION TO MOTION** |
| Centerra Group, LLC, f/k/a G4S | ) | **FOR SUMMARY JUDGMENT** |
| Government Solutions, Inc., f/k/a | ) | **BY DEFENDANTS** |
| Wackenhut Services, Inc., and Jason | ) | |
| Quattlebaum, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |

## INTRODUCTION

This case arises from the unjustified criminalization by Defendants of a dispute between two recently divorced parents over communication about their three minor children. It is not about threats or the endangerment of any person. It is not about insults or harassment, except as the Plaintiff's ex-wife defined harassment to mean any questions posed to her about their children, all of whom were in her custody. Defendants sought and secured – less than six hours after being asked to do so by Plaintiff's ex-wife – a warrant for the arrest of Plaintiff. They conducted no investigation. They sought no legal advice until after the warrant had been issued and then did so without fully informing the county prosecutor or the judge of the facts. Their actions in the aid of Plaintiff's ex-wife, a co-worker – they and she worked at the Savannah River Site – are inexplicable and resulted in the arrest, handcuffing, shackling and incarceration of the Plaintiff. There is more than sufficient evidence to submit this case to the jury as explained below.

1

## FACTS EVIDENT FROM THE RECORD

The chronology of this matter is particularly significant in light of the claims at issue, all turning on the lack of probable cause at the time the Defendants sought the warrants at issue. Plaintiff and his ex-wife, Lana Cox, now Lana Patterson, separated at her demand in early 2012. They lived together until that time with their three children in Columbus County, Georgia in the Augusta area. At the time and continuing to the present, Lana Cox worked at the Savannah River Site in Aiken County, South Carolina. Plaintiff worked at the time in Augusta, Georgia. As the result of an initial hearing concerning their separation, the Superior Court of Columbus County, Georgia, Domestic Relations Division, issued a Temporary Order on April 10, 2012. (Exh. 1, Order of April 10, 2012). Pertinent to the issues in this case, the Georgia court ordered the appointment of Doug Nelson as the Guardian Ad Litem for the minor children, who were assigned to the custody of Lana Cox – Clinton McKay, Charles Broderick, and Aiden Katherine Cox. The court also ordered that, "there shall be no contact between the parties *except that the parties may communicate regarding issues with the minor children.*" This remained the only order in the divorce case until a final decree was issued on September 28, 2012. (Exh. 1, p. 3).

From the beginning, Lana Cox refused to communicate with Plaintiff about the children. As with any children, there were issues of school, health, security and the stress of a bitter divorce. She attempted to cut him off completely and he responded by attempting to communicate by email, text and phone call. (Exh. 2, Cox depo, pp. 15-95). Plaintiff's efforts to communicate about the children (who at the time of the separation were 11, 13 and 16 years of age) were specifically permitted by the Temporary Order of the Georgia court. Prior to the final decree being issued, she demanded on September 5 and 10, 2012, that Plaintiff stop emailing her at her office at SRS, despite the specific court mandate that both parties could communicate

about the children.  (Exh. 4, Lana Cox Email of September 10, 2012).  Lana Cox (now Patterson) has testified that she also blocked Plaintiff from the Facebook account, blocked him from sending her texts and demanded that he never communicate with her at all unless it was about an "emergency" affecting the children.  (Exh. 13, Deposition Excerpts of Lana Patterson, p. 45-46).  She also testified that she was forbidden to receive or send emails from her work computer using her private email account.  (Exh. 13, Deposition Excerpts of Lana Patterson, p. 43).  Her definition of what constituted an emergency was unclear, but what is clear from her review of emails in her deposition is that she did not regard a child not doing school work, or a child requiring medical attention, or a child requiring counseling and evaluation, or a child's social media account being abused to be topics deserving of contact by the Plaintiff.  (Exh. 13, Deposition Excerpts of Lana Patterson, p. 40-41, 54-67).  Nothing, however, obliged Plaintiff to ignore his own concern over any of those issues with his children or to refrain from trying to communicate with his ex-wife about them.

The final divorce decree executed by the Georgia court on September 28, 2012 acknowledged the problems with communication, holding the following, "the parties agree that there have been some difficulties regarding communication regarding issues with the minor children.  The parties agree that by September 1, 2012, they shall both obtain a one (1) year subscription to "Our Family Wizard" which is a communication tool for helping divorced and separated families.  The parties bear the cost for their individual subscription for the program."  The order did not ***require*** that this be the sole means of communication about the children.  In anticipation of further communication problems, the Georgia court specifically required that, "In the event there are any communication issues between the parties, the Guardian Ad Litem shall be contacted prior to the involvement of law enforcement, attorneys, the Court, etc."  Doug

Nelson, the order noted, had agreed to continue in the role of Guardian Ad Litem.  (Exh. 3, Order of September 28, 2012, p. 2-3).

Subsequent to the divorce, the communication problems did not end.  Lana Cox continued to ignore Plaintiff's requests for information about the children.  She ignored his inquiries posted on Our Family Wizard.  (Exh. 2, Cox Depo.).  He left her voice mail messages. He sent her texts.  He emailed her private account.  And as had been their practice before their estrangement, he emailed her account at her office as an employee of a contractor at the Savannah River Site in Aiken (SRS).  At times, she responded and at times, she refused to respond.  At times, she used her SRS email account to contact Plaintiff, also with communications about their children.  (Exh. 4, Lana Cox Email of September 10, 2012).  Indeed, throughout the period of separation prior to the final divorce decree and after the final decree was entered, she often initiated email contact with the Plaintiff, despite her employer's prohibition on excessive use of her work computer for personal business.  (Exh. 15, Summary of Emails; Exh. 13, Deposition Excerpts of Lana Patterson, p. 31-32, 72-77).  On the whole, she attempted to cut Plaintiff out of any genuine knowledge about their children's' welfare or activities unless the contact suited her own wishes.

Lana Cox testified that, while she blocked Plaintiff from her Facebook account and blocked his texts and did not access her private email account while at work, she did not block his emails from coming to her work computer.  She explained that she had his emails redirected to a junk mail account, but still opened them all, saying she needed to see if they related to an emergency.  (Exh. 13, Deposition Excerpts of Lana Patterson, p. 36-43, 54-55, 59-63, 92).  She testified that receiving these emails caused her to be anxious, but she admitted that from the

beginning of her separation from Plaintiff, she suffered from anxiety and depression and received treatment, including medication. (Exh. 13, Deposition Excerpts of Lana Patterson, p. 79-81).

Plaintiff, an Army Reservist, was called to active duty for service in Kuwait on October 2, 2012. (Exh. 2, Cox Depo, p. 107-111). On January 15 (or January 14, the testimony and records of Defendants are in conflict), 2013, Lana Cox contacted an employee of the private security firm under contract with SRS, then known as WSI, to provide security services within the boundaries of the SRS facility, a nuclear weapons and research facility. The Defendants' records reflect that this was at 0820 hours, or 8:20 a.m. The initial contact was by phone. The security officer she called, Defendant, Jason Quattlebaum, subsequently met with her, but the time this occurred is not clear. By 2:00 p.m. that same day, Quattlebaum had gone to the magistrate in New Ellenton, asked for and received a warrant for the arrest of Plaintiff, who was at that moment in process to leave for Kuwait on active duty in the U.S. Army. (Exh. 5, Warrant of January 14, 2013; Exh. 6, Uniform Crime Report of January 15, 2013 and US Army Email).

Prior to going to the magistrate, Quattlebaum has testified all he did was to talk to Lana Cox and to read a copy of the final divorce decree of the Georgia court. He did not seek legal counsel. He did not contact the GAL, Doug Nelson. He did not contact the Georgia court. His contact with the police authorities in Georgia was cursory from which he received nothing. (Exh. 7, Quattlebaum Depo., pp. 60-61). Solely on the word of Lana Cox and apparently based on her characterization of the final divorce decree, he sought to have Plaintiff charged with Second Degree Harassment. The offense of Harassment in the Second Degree is defined in S.C. Code 16-3-1700 (B):

> (B) "Harassment in the second degree" means a pattern of intentional, substantial, and unreasonable intrusion into the private life of a targeted person that serves no legitimate purpose and causes the person and would cause a reasonable person in his position to suffer mental or emotional distress. Harassment in the second degree may include, but is

5

not limited to, verbal, written, or electronic contact that is initiated, maintained, or repeated.

Second Degree Harassment is set forth in S.C. Code 16-3-1710 and has two distinct levels as described in subsections A and B:

> (A) Except as provided in subsection (B), a person who engages in harassment in the second degree is guilty of a misdemeanor and, upon conviction, must be fined not more than two hundred dollars, imprisoned not more than thirty days, or both.
>
> (B)  A person convicted of harassment in the second degree is guilty of a misdemeanor and, upon conviction, must be fined not more than one thousand dollars, imprisoned not more than one year, or both if:
>
>> (1) the person has a prior conviction of harassment or stalking within the preceding ten years; or
>>
>> (2) at the time of the harassment an injunction or restraining order, including a restraining order issued by the family court, was in effect prohibiting the harassment.

The application for the warrant prepared by Quattlebaum was approved by his supervisor, Sharon Cormier.  At the time, both worked for Wackenhutt Security, a firm now reorganized and re-named Centerra Group, LLC.  As prepared by Quattlebaum, the warrant recounts that:

> "Between the dates of March 9, 2012 and January 14, 2013, the defendant Charles Cox did repeatedly email the victim (Lana Cox) at her work email system.  On September 5, 2012 and September 10, 2012, the victim did notify the defendant to stop any and all contact, but the defendant continued to email the victim.  This incident occurring at the work place of the victim at SRS Building 773-A room 204 in Aiken County, SC and causing mental and emotional distress."

(Exh. 5, Warrant of January 15, 2013; Exh. 6, Uniform Crime Report).

While Quattlebaum has testified that before going to the magistrate, he read the final divorce decree and accepted Lana Cox's claim that the decree required the parties to only communicate by Our Family Wizard about the children, his presentation to the magistrate only makes reference to demands by Lana Cox that Plaintiff stop contacting her during the period before the final decree was executed on September 28, 2012 and when the prior order

specifically provided for contact about the children.  He also apparently neglected the portion of

the final decree requiring recourse to Doug Nelson, the GAL, prior to either party going to police

authorities.  Quattlebaum has testified that he was provided many emails by Lana Cox sent to her

by the Plaintiff and that he discussed these with the magistrate.  All of these related specifically

to the three children of the Plaintiff and Lana Cox.  (Exh. 2, Cox Depo., pp. 15-95).

       Sharon Cormier has testified that the warrant Quattlebaum secured with her approval was

the only one like it she had ever had any connection with.  (Exh. 14, Deposition Excerpts of

Sharon Cormier, p. 17).  In advance of approving the warrant, she spoke to Lana Cox by phone,

but was unclear what emails, if any, she reviewed, or if she reviewed the divorce decrees.  (Exh.

14, Deposition Excerpts of Sharon Cormier, p. 24-37).  The sole basis for her approval of

issuance of the warrant for Plaintiff's arrest was her short conversation with Lana Cox and

listening to Quattlebaum's summary of his "investigation."  She approved the warrant because

Lana Cox claimed to be upset over receipt of emails from the Plaintiff which she had asked him

not to send.  She made no effort to ascertain if these emails were reasonable and authorized by

the divorce decree issued by the Georgia Court.  She simply accepted Lana Cox's allegations

without any review, questioning or investigation to determine their accuracy.  (Exh. 14,

Deposition Excerpts of Sharon Cormier, p. 24-37, 52-58, 65, 75, 94-99).  Cormier never required

or even suggested that Lana Cox simply block Plaintiff's emails.  She made no effort to ascertain

when, how or how frequently, it was reasonable for Plaintiff to communicate with Lana Cox

about their three minor children.

       The Defendants note in their memorandum in support of their motion that Lana Cox also

complained that Plaintiff made a report to the Corps of Engineers asking them to check to see if

fill material placed by her on the rear of their property posed any problems under the Clean

Water Act. Plaintiff has testified he made this request on advice of counsel experienced in
Section 404 of the Clean Water Act, 33 U.S.C. Sec. 1344. His concern was over serious
potential problems any violation of the prohibition might case both himself as co-owner and his
son, who was tasked by Lana Cox to place this fill material. (Exh. 2, Deposition Excerpts by
Charles Cox, p. 197-201).

Two weeks after securing the warrant, Quattlebaum, again responding to a request from
Lana Cox, sought permission from his superiors to release his Uniform Crime Report
documenting his securing the warrant. (Exh. 6, Email from the U.S. Army and WSI Document
Review Form for Release of Documents/Information Outside of WIS-SRS). The release of the
report was, as requested by Lana Cox, to be to the U.S. Army. (Exh. 7, Quattlebaum Depo, pp.
113-116). Quattlebaum's superiors approved the release of the report to the Army. Despite the
fact that the WSI Document Release Form (Part of Exh. 6) says Quattlebaum was the requestor,
he denied having anything to do with the release, noting that Sharon Cormier, his supervisor was
responsible. Predictably, Plaintiff's commanding officer reacted to the report by issuing a
Military Protective Order forbidding him to contact Lana Cox by any means other than Family
Wizard and by placing him under investigation during which time he was deprived of his
weapon – this in a combat zone. (Exh. 2, Cox Depo., pp.107-111, 121-141; Exh. 16, Military
Protective Order). Plaintiff's commanding officer provided the order was to expire on October
1, 2013. Plaintiff obeyed the order. However, Plaintiff was transferred to a different Army unit
prior to October 1, 2013, and upon transfer to command of a different commanding officer, he
sent emails to Lana Cox in late August and early September 2013. His new commander adopted
the terms of the protective order and Plaintiff ceased any further direct communication with Lana
Cox. (Exh. 2, Deposition Excerpts of Charles Cox, p. 137-140).

8

Neither the testimony of Quattlebaum nor the Assistant Solicitor he consulted, David Miller, have identified the date, but, in the words of Miller, "On or before February 2013," they spoke about the warrant already issued for the arrest of Plaintiff for Second Degree Harassment. Miller testifies that Quattlebaum "conveyed that in Plaintiff and Ms Cox's divorce decree, the parties were to communicate via a website program…"  The copies of text messages attached to his Affidavit, the details of their communication and what seems to be the actual date of their conversation – February 20, 2013 – are evident.  Quattlebaum asks him, "what is the appropriate charge if I can prove the suspect violated a court order in GA."  Subsequently, Quattlebaum tells Miller, "it is in his divorce paperwork that he is to use a certain program to communicate and he has not used the program."  Miller responds, without ever seeing the decree and merely relying on Quattlebaum's description of it, "There are two CDR charges for Harassment 2nd.  2402 is the one you want.  It is a GS charge.  2401 is a magistrate charge when there is NOT a restraining order in effect.  Check the CRD code on your warrant."  (Dkt. No. 21-22, Affidavit of David Miller attached to Defendants' Motion).

In a move worthy of Franz Kafka, Quattlebaum returned to the magistrate and convinced him to issue a new warrant on February 25, 2013.  This warrant recounts the charge this way, reflecting Lana Cox's description of the Georgia divorce decree, never read by Miller:

> "Between the dates of March 9, 2012 and January 14, 2013, the defendant Charles Cox did repeatedly email the victim (Lana Cox) in her work system during which violated a valid Court Order of the Columbia County Ga Family Court.  This incident occurring at the work place of the victim at SRS Building 773-A room 204 in Aiken County, SC and causing mental and emotional distress."

(Exh. 8, Warrant of February 25, 2013).

It was pursuant to this warrant that Plaintiff was ultimately arrested at the Aiken County Detention facility on February 7, 2014, after his return from active duty in the Army.  He was

handcuffed and shackled and placed in jail.  He was released on bond toward the end of the day.

At any time between issuance of the warrant on February 25, 2013 and Plaintiff's arrest,

Quattlebaum and Cormier could have withdrawn the warrant.  (Exh. 14, Deposition Excepts of

Sharon Cormier, p. 99).  They had nearly a year to conduct a true investigation, but did not do so.

For instance, had they asked Lana Cox about her emotional state, she would have offered them

the same explanation she did in her deposition that her anxiety and depression began

immediately upon separation from Plaintiff and was not, therefore, generated by the emails from

Plaintiff.  They would have learned that Lana Cox was willingly opening Plaintiff's emails and

even initiating emails of her own on her work computer.  They would have learned that Lana

Cox's claim that this was necessary in order to apprise herself of any emergency related to the

children was untrue.  As she told Plaintiff in one of her emails, Plaintiff could have called her

office which was served by a secretary in the event of an emergency.  (Exh. 17, Email of 9/10/12

at 4:56 p.m.).  Instead, Quattlebaum and Cormier decided to proceed with the arrest of Plaintiff

simply because Lana Cox told them she asked him to stop sending her emails about their

children, emails she voluntarily opened and read.

     On March 26, 2014, at the conclusion of a preliminary hearing, magistrate judge Melanie

Dubose dismissed the charge as lacking probable cause.  The transcript of the hearing reveals the

complete lack of any justification for the warrant or the arrest.  Quattlebaum admitted in

succession in relation to the elements of a General Session 2nd Degree Harassment charge:

1.   He had no knowledge of Plaintiff's being convicted in the past 10 years;

2.   The only "restraining order" of which he had knowledge was the Georgia final

    divorce decree;

3. The only violation of the divorce decree of which he was aware was that Plaintiff tried to communicate with Lana Cox in ways other than using Our Family Wizard;

4. That the divorce decree did not say specifically that Plaintiff was limited to use of Our Family Wizard to communicate with Lana Cox; and

5. That he took Lana Cox's word that prior to coming to him, she had gone to the GAL as the order requires, never bothering to contact the GAL himself.

On the basis of this testimony, Judge Dubose granted the motion to dismiss the warrant for lack of probable cause.  (Exh. 9, Transcript of Preliminary Hearing, March 26, 2014). Nothing in Quattlebaum's deposition testimony or the affidavits of Lana Cox (now Patterson), David Miller or Judge Sullivan reveal any other indicia of probable cause.  Quattlebaum and his superiors blithely sought the arrest and prosecution of the Plaintiff purely at the request of Lana Cox who was unhappy that her ex-husband, the Plaintiff, asked her questions about the welfare and activities of their three children.  There was never any indication that there was unwanted contact from the Plaintiff that served "no legitimate purpose" or that she suffered emotional distress that "a reasonable person in (her) position" would suffer from the contact by Plaintiff – questions about their three minor children.  There was never any indication whatsoever that Plaintiff, by sending emails to Lana Cox, was violating any court order.  There was never probable cause to support a charge of any form of 2nd Degree Harassment against the Plaintiff.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is only appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). "In determining whether a genuine issue of material fact exists, we view the facts and draw all reasonable inferences in the light most favorable to the non-moving party." Hoschar v.

Appalachian Power Co., 739 F.3d 163 (4th Cir. 2014), citing Glynn v. EDO Corp., 710 F.3d 209 at 213 (4th Cir.2013), "However, to show that a genuine issue of material fact exists, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.' " Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))."  As explained below, the relevant facts evident from the record create, at a minimum, a genuine issue of material fact concerning the Plaintiff's causes of action.

**ARGUMENT AS TO CAUSES OF ACTION**

**I.**

**MALICIOUS PROSECUTION**

The seminal question as to all of Plaintiff's claims is whether the Defendants sought to charge him and have him arrested without probable cause.  Defendants' actions taken without probable cause constitute the tort of malicious prosecution.  The elements of that tort are:

1)   the initiation or continuation of original judicial proceedings, either civil or criminal;

2)   by, or at the instance of the defendant;

3)   termination of such proceedings in plaintiff's favor;

4)   malice in initiating such proceedings;

5)   want of probable cause; and

6)   resulting injury or damage.

There is no question that the Defendants initiated and continued a criminal proceeding against Plaintiff that caused him to be charged, arrested and incarcerated.  The first two prongs of malicious prosecution are, therefore, not in dispute.

The criminal prosecution was terminated in Plaintiff's favor when on March 26, 2014, at the Preliminary Hearing, Judge Dubose dismissed the charge against him for lack of probable

cause.  (Exh. 9, Transcript of Preliminary Hearing, March 26, 2014).  In South Carolina, the

pursuit of proceedings without probable cause is presumed to be from malice.  Parrott v.

Plowden Motor Co., 246 S.SC. 318, 322, 143 S.E.2D 607 (1965); and Melton v. Williams, 218

S.C. 182, 185, 314 S.E.2D 612, 614 (Ct. App. 1984).   South Carolina's courts have held that

malice is the explanation for pursuit of proceedings without probable cause.  Where criminal

proceedings are dismissed under conditions consistent with the innocence of the accused,

including dismissal of a charge on a preliminary investigation, that is sufficient termination to

support a malicious prosecution claim.  Goodwin v. Metts, 885 F.2d 157 (4th Cir.  1989);

McKenney v. Jack Eckerd Co., 304 S.C. 21, 402 S.E.2D 587 (1991); and Mack v. Riley, 282

S.C. 100, 316 S.E.2D 731 (Ct. App. 1984).

Defendants argue without the benefit of any legal authority that the ability of the solicitor

to "re charge" Plaintiff pursuant to the first warrant – the magistrate level warrant which made no

reference to the Georgia divorce decree – undermines this prong of Plaintiff's malicious

prosecution claim.  The law in South Carolina is clear that dismissal of the charge actually

brought against a plaintiff satisfies this prong of the claim so long as the dismissal related to the

plaintiff's guilt under that charge and was not purely procedural.  Judge Ralph King Anderson,

Jr. in his text South Carolina Requests to Charge, provided this language for the termination

prong of a malicious prosecution claim:

> In an action for malicious prosecution, the plaintiff must establish that the original
> proceeding was terminated in the plaintiff's favor.  It is enough to support an action for
> malicious prosecution that the proceeding was terminated so that it cannot be revived and
> the prosecutor, if he proceeds further, will be put to a new action.
> Where criminal charges are dismissed for reasons consistent with the innocence
> of the accused, there is sufficient termination upon which to base the action for malicious
> prosecution.  However, the fact that some charges are dismissed does not per se support
> an action for malicious prosecution if the accused is convicted on other charges.

Judge Anderson's charge is well rooted in the law of South Carolina. It has long been held that the discharge of the accused by a magistrate on a preliminary investigation is a sufficient termination as will sustain such an action. Harrelson v. Johnson, 119 S.C. 59, 111 S.E. 882 (1922); Jennings v. Clearwater Mfg. Co., 171 S.C. 498, 172 S.E. 870 (1934); and Ruff v. Eckerds Drugs, 265 S.C. 563, 220 S.E.2d 649 (1975).  This is to be distinguished from when a prosecutor merely dismisses a case in a "nolle prosequi."  This is not a termination of a prosecution sufficient to give rise to a claim for malicious prosecution.  Mack v. Riley, supra.  In this case, Plaintiff was exonerated by the dismissal of the charge against him by the magistrate on his motion at the preliminary hearing and after the Defendants failed to demonstrate any probable cause justifying their prosecution of him.  Therefore, under the decisions cited above, the prong of termination of the prosecution is established.

In addition to the presumption of malice of the Defendants which arises from their pursuit of an action without probable cause, the record contains specific evidence of their malice.  They not only pursued a criminal charge they were forced at the Preliminary Hearing to admit was utterly unfounded, they gratuitously worsened their actions by sending the report of their actions to the U.S. Army where Plaintiff was serving a tour of active duty in Kuwait, an action certain to cause him substantial harm.  There is simply no other explanation for their actions, than overt malice against Plaintiff.

As to injury to Plaintiff, there is also no question that he was injured.  He was arrested, handcuffed, shackled and incarcerated.  His children were aware he was being arrested and jailed. He was required to pay a lawyer to defend him and dispose of the meritless charges against him.  His reputation is stained by this action in a way that can never be completely erased due to the prevalence of internet data.

The record is replete with proof that Defendants lacked probable cause to pursue the charge of Second Degree Harassment against Plaintiff.  Most compelling is the testimony of Quattlebaum in the Preliminary Hearing.  He admitted that he never had any reason to believe that any of the elements of the offense were supported by sufficient "facts and circumstances as would excite the belief in a reasonable mind acting on the facts within" his knowledge that Plaintiff was guilty of harassment.  Only the facts known to Defendants at the time they pursued this charge are relevant.  Brown v. Bailey, 215 S.C. 175, 54 S.E.2D 769 ( 1949); and China v. Seaboard Air Line Ry, 107 S.C. 179, 92 S.E. 335 (1917).

As to the elements of harassment itself, it strains credulity to suggest that any reasonable police officer like Quattlebaum or Cormier would believe that receipt of emails by an ex-wife from her ex-husband only concerning their three minor children and in no way threatening to her would give rise to any fear or distress sufficient to meet the test for harassment.  When the record is clear that Plaintiff had every right to send those questions and to continue to insist on answers from her, Quattlebaum's actions are shown to be even more outrageous.

There is yet another reason that Defendant's actions were indefensible.  Lana Cox was receiving the emails about which she complained on her work computer at SRS, a nuclear weapons and research facility.  She was under a duty not to use this computer for personal communications.  Moreover, all she had to do if she did not want to receive Plaintiff's messages any longer, all she had to was – as she specifically threatened to do in an email on September 10, 2012, to block Plaintiff's emails.  (Exh. 4, Lana Cox Email, September 10, 2012).  The fact that she did not block the emails is perhaps the clearest evidence that she was in no way distressed by the messages about their children from Plaintiff.  Indeed, it is hard to imagine a reason a mother would be distressed about mundane questions about her children from their father.

The facts paint a clear picture. An angry ex-spouse did not want to have any contact with her ex-husband, including about their children. She sought to exclude him from their lives. His insistence on knowing about their welfare and activities angered her to the extent that she concocted a charge of harassment – a charge the Defendants, her co-workers, inexplicably were willing to pursue for her, all for the sole purpose of inflicting pain and injury on the person she was so angry with, the Plaintiff. Quattlebaum has offered no explanation for why he reached the conclusion Plaintiff was guilty of harassment other than his reliance on the claims by this angry ex-spouse that Plaintiff's actions were improper. His blunt admission at the Preliminary Hearing that there was no proof known to him at the time he sought the warrant is an admission that he never had probable cause to support the warrant he secured. (Exh. 9, Transcript of the Preliminary Hearing).

As to the second warrant – the February 25, 2014 warrant under which the Plaintiff was arrested and incarcerated – Quattlebaum's actions are most offensive. He told the magistrate something he later admitted in the Preliminary Hearing was not true – that the Georgia final divorce decree forbade any communication between the parties other than through Our Family Wizard. He readily admitted at the Preliminary Hearing that the decree does not specifically provide for this limitation. (Exhibit 9, Transcript of Preliminary Hearing, p. 11-13). In addition, he did nothing to check on Lana Cox's claim that she tried to resolve the matter by contacting the GAL as required by the divorce decree or to determine whether any effort was made by her to enforce her allegation that Plaintiff was violating the decree. (Exhibit 9, Transcript of Preliminary Hearing, p. 15-16). He also told the magistrate who issued the warrant that Plaintiff's contacts with Lana Cox going back to March 2012 were prohibited, even though he

admitted at the Preliminary Hearing that, even by his reading of the divorce decree, use of Our Family Wizard was not mandated until the decree was issued on September 28, 2012.

The question of whether probable cause existed to support issuance of a warrant is quintessentially one for the jury. Elletson v. Dixie Home Stores, 231 S.C. 565, 99 S.E. 2d 384 (1957), "It is essentially a matter for jury, under proper instructions of court, to pass on sufficiency of facts and circumstances relied on by plaintiff to show lack of probable cause for prosecution of criminal action." The facts in the record are more than sufficient to submit the claim for malicious prosecution to the jury.

Defendants' claim that they relied on legal counsel in pursuing the charge against Plaintiff is not supported by any evidence. They sought the first warrant on January 15, 2013 only 5 and one half hours after Lana Cox's first contact with Quattlebaum and without any contact with a lawyer. Sometime in February, and most specifically on February 20, 2013, Quattlebaum asked David Miller, an Assistant Solicitor what the appropriate charge would be "if I can prove the suspect violated a court order in GA." (Dkt. No. 21-22, Affidavit of David Miller). There is no evidence that Miller ever looked at the divorce decree. While a defendant in a malicious prosecution case may raise the defense that he acted in good faith on advice of counsel, that advice must be "advice of fully informed counsel." The Defendants must have made a fair, full and truthful disclosure of all the facts" to the counsel. It is simply not possible for any attorney to provide proper advice to Quattlebaum without actually reading the divorce decree. The hypothetical question posed to Miller by Quattlebaum hardly constitutes advice of counsel to Quattlebaum supporting his seeking the February 25, 2013 warrant that alleged Plaintiff was violating a court order barring his contact by email with Lana Cox. Melton v. Williams, supra., 314 S.E.2D at 615. Quattlebaum's supervisor, Cormier, never had any

contact with Miller or any lawyer.  (Exh. 14, Deposition Excerpts of Sharon Cormier, p. 52).

Defendants' citation to the Affidavit of the magistrate who issued the warrants, Judge Sullivan, does not constitute competent evidence.  All Sullivan did is rely on what Quattlebaum told him.  If Quattlebaum had *no reasonable basis* for his statements, as he specifically acknowledged at the Preliminary Hearing, Judge Sullivan's issuance of the warrant, in and of itself, cannot constitute probable cause.  Persons who procure a malicious prosecution cannot hide behind the actions of a misinformed prosecutor or a magistrate who issues a warrant on false or incomplete evidence.  Goodwin v. Metts, 885 F.2d 157 (4th Cir. 1989).

In summary, there is, at a minimum a genuine issue of material fact as to Plaintiff's claim for malicious prosecution and the motion should be denied as to this claim.

## II.

### 42 U.S.C. § 1983:  VIOLATION OF FOURTH AMENDMENT RIGHTS

The Defendants summarize the issue as to the 1983 cause of action this way:

> Under the Fourth Amendment, the people are "to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, and no Warrants shall issue, but upon probable cause. . ." U.S. Const. amend. IV…

> There is no question that at the time of this incident, the right to be free from arrest absent probable cause was clearly established. Therefore, this court must determine whether the facts, taken in the light most favorable to Plaintiff, indicate that a "police officeracting under the circumstances at issue reasonably could have believed that he had probable cause to arrest" Plaintiff. *Sevigny v. Dicksey*, 846 F.2d 953, 956 (4th Cir. 1988). An event which triggers the protections of the Fourth Amendment occurs "when there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989). "Probable cause, for FourthAmendment purposes, means facts and circumstances within the officer's knowledge thatare sufficient to warrant a prudent person, or one of reasonable caution, in believing, in thecircumstances shown, that the suspect has committed, is committing, or is about to commitan offense." *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992).

Defendants proceed to argue that there was probable cause to support Defendants' seeking a warrant for the charge and arrest of Plaintiff for Second Degree Harassment.  As

argued above, there was never probable cause to support such a charge. Neither Quattlebaum, nor Cormier, nor any employee of the Defendant corporation every possessed any information giving rise to a reasonable belief that Plaintiff had committed the acts they accused him of in securing the warrants at issue. The warrant under which he was arrested and jailed, the February 25, 2013 warrant, is particularly outrageous given Quattlebaum's admission that the Georgia court order he told the magistrate Plaintiff had violated, *did not specifically forbid* Plaintiff's actions.

Defendants argue that Quattlebaum's "investigation" of the complaint of Lana Cox insulates them from liability as it supports his conclusion there was probable cause under the "totality of circumstances." It does not. First, Defendants' "investigation" lasted exactly 5 and one half hours before Quattlebaum, with his superiors consent, sought and obtained the first warrant on January 15, 2013. Cormier's involvement prior to issuance of the warrant was merely to listen to Lana Cox make statements she made no effort of any kind to confirm. (Exh. 14, Deposition Excerpts of Sharon Cormier). Second, Defendants claim that listening to an ex-spouse claim she is suffering emotional distress because her ex-husband does not stop asking her questions about their children supports a charge of harassment. This bizarre suggestion ignores the plain wording of the harassment statute – the emotional distress must result from "unreasonable intrusion into the private life of a targeted person that serves no legitimate purpose…" S.C. Code 16-3-1700(B). For a police officer to proceed to arrest a citizen because his ex-spouse is upset over requests for information about their children – requests which are entirely lawful and proper – regardless of whether she asked him to stop, can under no standard of civilized conduct be considered reasonable. No reasonable police officer could possibly believe such conduct was proper. Any reasonable police officer would have to know that such

an arrest on this basis was a fundamental violation of basic rights protected in the Constitution.

Where a police official acts in this way, a claim for constitutional deprivation is proper under

1983.  Goodwin v. Metts, supra.

Of course, Defendants' conduct did not stop with charging Plaintiff with magistrate level

Second Degree Harassment; they proceeded to increase the charge to General Sessions level with

an entirely baseless claim that Plaintiff was violating a Georgia court order and to not only

convey this misinformation to the magistrate on February 25, but to also misrepresent that

Plaintiff was violating the order back to March 9, 2012, over six months before the order they

claimed was being violated was signed by the Georgia court.  Defendants did not act reasonably,

and the best evidence of that is the admission by Quattlebaum at the Preliminary Hearing that he

had no knowledge of any facts supporting the allegations in the warrant he secured that

succeeded in having Plaintiff arrested, handcuffed, shackled and jailed.   (Exh. 9, Transcript of

Preliminary Hearing).

Defendants' effort to seek shelter under the affidavits of the magistrate who issued the

warrant and the prosecuting attorney who offered them "legal advice" is unavailing for the same

reason.  Quattlebaum did not tell either of these people the truth.  He told them both that there

was a Georgia court order in effect from March 9, 2012 which forbid Plaintiff from

communicating with Lana Cox other than through Our Family Wizard.  That was not the truth.

Neither the magistrate nor the prosecutor has testified that they ever read the court order.

Quattlebaum admitted at the Preliminary Hearing that the Georgia order did not specifically

require use of Our Family Wizard – which admission resulted in the immediate dismissal of the

charge of Second Degree Harassment for lack of probable cause.  The evidence is more than

sufficient to support a jury finding that there was never probable cause to support the

Defendants' prosecution of Plaintiff for Second Degree Harassment.

## III.

## DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY IN THIS CASE

Defendants summarize the standard for establishing qualified immunity for public

officials acting in a discretionary capacity this way:

> In setting forth its guidelines, the Supreme Court ruled that "government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person should have known." *See, Id*., at 818. The Court further held that "[r]eliance on the objective reasonableness of an official's conduct is measured by reference to clearly established law, and should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *See, Id*. Subsequently, the Supreme Court held in *Anderson v. Creighton*, 483 U.S. 635 (1987), that a court must look for the "'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." *See, Id.*, at 639. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. ... [This] is to say that in the light of preexisting law the unlawfulness must be apparent." *See, Id*., at 640. In *Torchinsky v. Siwinski*, 942 F.2d 257 (4th Cir. 1991), the Fourth Circuit explained the rationale for qualified immunity:

> > The grant of qualified immunity to government officials ensures that these officials can perform their duties free from the specter of endless and debilitating lawsuits. Without such an immunity, the operations of government would be immobilized. Permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.
> > 942 F.2d at 260-261. (Citations omitted).

> In determining whether an individual defendant is entitled to qualified immunity, the courts have employed a two-step process as set forth in *Saucier v. Katz*, 533 U.S. 194 (2001). First, the court must first determine "whether a constitutional right would have been violated on the facts alleged." 533 U.S. at 200. If the facts viewed in a light most favorable to the plaintiff do not establish a constitutional violation, the inquiry ends and the plaintiff cannot prevail. *Parrish v. Cleveland*, 372 F.3d 294, 301 (4th Cir. 2004). "Next, assuming that the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an

objectively reasonable officer that his conduct violated that right." *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003).

Defendants claim that Quattlebaum's "consultation" with David Miller as Assistant Solicitor renders his otherwise outrageously unreasonable conduct protected. Similarly, they argue that the fact that Judge Sullivan issued a warrant based on Quattlebaum's extraordinary misrepresentations of fact is a shield behind which they can hide from the consequences of their actions. First, there was no consultation with Miller. Quattlebaum's text messages merely posed a hypothetical to Miller – "if I could prove" that Plaintiff had violated a Georgia court order. Miller's "advice" that if this could be proven, a heightened charge of Second Degree Harassment would be proper hardly constitutes meaningful legal consultation. Miller never saw the court order. Similarly, issuance of the warrant by Judge Sullivan based on the false claim by Quattlebaum – a claim he clearly disavowed at the Preliminary Hearing – that Plaintiff had been violating a court order since March 9, 2012 renders the warrant facially defective. Police officers are not free in our society to misrepresent the facts to their lawyers or, worse, to judges and then hide behind the defective warrants that result from their misrepresentation.

Defendants' claim that their actions were not clearly unconstitutional and that they may not be held accountable for actions taken in "grey areas" asks this Court to bless the deliberate procurement of a General Sessions warrant for arrest and incarceration of a citizen based on knowing misrepresentations. The testimony of Quattlebaum at the Preliminary Hearing clearly establishes that he always knew that what he told both Miller and Judge Sullivan was false. Any reasonable police officer must be held to understand that all citizens have a constitutional right not to be arrested and incarcerated except on evidence that constitutes probable cause. It is a well-established principal that police in this country may not with impunity misrepresent facts to a judge to secure a warrant for arrest of a citizen. <u>Goodwin v. Metts, supra.</u> That is what the

evidence shows Defendants did in this case and they are not, therefore, entitled to qualified immunity.

## IV.

## CENTERRA IS LIABLE ALONG WITH OFFICER QUATTLEBAUM

Defendant Centerra claims it is not liable along with Officer Quattlebaum as there are no facts indicating its participation in the actions that injured Plaintiff. This is incorrect. Before Quattlebaum was allowed to seek the first warrant on January 15, 2013, he required the authorization of his supervisor, Sharon Cormier, who signed the Uniform Crime Report that day as "approving officer." (Exh. 6). Two weeks later the Information Security Officer for Centerra's predecessor, WSI, approved release of the Uniform Crime Report to the U.S. Army at Quattlebaum's request. (Exh. 6). This report clearly states that the sole reason for Defendants' seeking and obtaining a warrant for Plaintiff's arrest was the complaint by Lana Cox that she was receiving emails from her ex-husband, the Plaintiff, after she asked him to stop. There is no mention of threats or insults or embarrassment. As noted above and as is evident in the emails themselves, all of these were solely about questions Plaintiff had about his three children living with Ms Cox. There can be no question that the WSI hierarchy was aware of and approved of Quattlebaum's actions.

Nor did Quattlebaum's superiors' actions cease with the issuance of the two warrants in question. In March of 2013, Lead Investigator Sharon Cormier informed an attorney for Plaintiff who was seeking to have the charge withdrawn that she and WSI intended to pursue the charge and to have Plaintiff arrested. (Exh. 10, Investigating Officer's Report). Nothing could be clearer but that the charge and arrest and incarceration of Plaintiff was the result of a concerted effort by WSI and was fully coordinated within that organization, now known as Centerra.

Where an act, albeit with respect to a single plaintiff, evidences a policy of the superiors of the primary actor, that act can establish a policy of the superior sufficient to support supervisory liability is a Section 1983 action.  City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988); and Pembaur v. City of Cincinnati, 475 U.S. 469, 484-85 (1989).

The process which led to Plaintiff's arrest took nearly a year from late February 2013 until early February 2014.  At any point, Quattlebaum or Cormier could have conducted an actual investigation, which they did not do before securing the warrants, and had they done so, they would have learned that Lana Cox's claim about the divorce decree and her claims about being stressed over Plaintiff's emails were simply not true.  Instead, they pursued the arrest of a father of three minor children purely for no reason other than the fact that he tried to communicate with his ex-wife over his children's welfare.

As to a causal link, which Defendants say Plaintiff has not established, the approval for seeking the warrant by the Lead Investigator, Sharon Cormier, was a necessary prerequisite to Defendants' actions.  This argument is directly contradicted by Cormier's own testimony.  She testified that she approved both warrants.  (Exhibit 14, Deposition Excerpts of Sharon Cormier). Her approval of securing the initial warrant and the second one as well and her decision in March 2013 to continue the prosecution were what led to the arrest and incarceration of Plaintiff.  The link could not be clearer.

Defendants argue that the concept of supervisory liability for 1983 violations has been terminated by the Supreme Court's decision in Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009).  There is no support for this proposition.  There has been considerable debate about the implications of that decision, but no precedent has been identified indicating the Supreme Court intended to eliminate supervisory liability in 1983 actions.  Two law review articles are attached analyzing

24

Iqbal and related cases which conclude that supervisory liability is very much alive and well. (Exh. 11 and 12). In fact, as noted in one of the articles, in Connick v. Thompson, 131 S.Ct. 1350, 1359-1360 (2011), the Court reiterated the elements to establish supervisory liability for deliberate indifference to the denial of constitutional rights of a plaintiff. If Defendants are correct, that Iqbal rendered supervisory liability claims no longer viable, there would have been no reason for the Court to enunciate the elements for it two years later.

The evidence raises a genuine issue of material fact as to the role of the Defendant corporation in the violation of his civil rights. That role was one of a concerted, coordinated effort to violate his constitution rights by having him arrested and incarcerated without probable cause, the lack of which Defendants have admitted under oath. Defendants acted not merely out of indifference. They acted deliberately to deprive Plaintiff of his right not be arrested without probable cause. Defendant corporation is a private, for profit security firm. It is a contractor at the SRS facility performing the security function, one of many contractors there, including the contractor where Lana Cox worked when she persuaded Defendants to have Plaintiff arrested. It more than strains credulity and is contrary to the basic principals of our Constitution to argue that this private security firm is entitled to hide behind from the actions of its security officer, actions two other of its officials knew about and approved of. Goodwin v. Metts, supra.

**CONCLUSION**

For the reasons set forth above, Plaintiff respectfully requests that Defendants' Motion for Summary Judgment be denied.

Respectfully submitted,

WALKER MORGAN, LLC


BY:   s/William P. Walker, Jr.
        William P. Walker, Jr.  Fed ID # 4500
        bw@walkermorgan.com
        135 East Main Street
        Lexington, SC  29072
        (803) 359-6194

        Stanley E. Barnett  Fed ID # 5306
        stan.barnett@yahoo.com
        305 North Civitas Street
        Mt. Pleasant, SC  29464
        (843) 708-4887/(843) 884-1021

        Attorneys for Plaintiffs

September 25, 2017
Lexington, South Carolina