# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# AIKEN DIVISION

| | |
|---|---|
| Charles Cox, | ) |
|     Plaintiff, | ) Civil Action No.: 1:15-cv-04608-JMC |
| v. | ) **ORDER AND OPINION** |
| Centerra Group, LLC, and Jason Quattlebaum, | ) |
|     Defendants. | ) |

Plaintiff Charles Cox ("Plaintiff") brought this action against Defendants Jason Quattlebaum ("Quattlebaum") and Quattlebaum's employer, Centerra Group, LLC ("Centerra"),[1] pursuant to 42 U.S.C. § 1983, alleging a false arrest in violation of his Fourth Amendment rights and a state law claim for malicious prosecution. (ECF No. 1.) This matter is before the court upon review of Plaintiff's Objections (ECF No. 57) to the Report and Recommendation ("Report") issued by Magistrate Judge Shiva V. Hodges ("Magistrate Judge") on December 1, 2017 (ECF No. 54). The Report (ECF No. 54) recommended that the court grant Defendants' Motion for Summary Judgment (ECF No. 47). For the reasons set forth below, the court **ACCEPTS** the Report (ECF No. 54) and **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 47).

## I. FACTUAL AND PROCEDURAL BACKGROUND

In early 2012, Plaintiff separated from his wife, Lana Cox ("Ms. Cox"),[2] an employee with Savannah River Nuclear Solutions based at the Savannah River Site ("SRS") in Aiken County,

---

[1] Centerra is the successor corporation to Wackenhut Services, Inc., which was Quattlebaum's employer at the time of the events giving rise to the claims at issue. (ECF No. 47 at 1.) This order refers to Centerra as Quattlebaum's employer for ease of reference.

[2] Lana Cox's current name is Lana Casto Patterson. (ECF No. 47-24.) This order refers to her as Ms. Cox for ease of reference.

1

South Carolina. (ECF No. 48.) On September 28, 2012, a Consent Final Judgment and Decree of Total Divorce ("Consent Order") was entered between Plaintiff and Ms. Cox in Columbia County, Georgia. (ECF No. 47-3.) A provision of the Consent Order relevant to this case concerns the "Our Family Wizard" program, a web and mobile application designed to serve as a communication tool for divorced families. *Id.* at 3-4. This same provision acknowledges that "there have been some difficulties regarding communication [between Plaintiff and Ms. Cox]" and orders the parties to enter into a one-year subscription with Our Family Wizard by September 1, 2012. *Id.* The provision, however, does not explicitly state that Our Family Wizard is to be the exclusive means of communication between Plaintiff and Ms. Cox. *See id.*

On January 14, 2013, Ms. Cox contacted Defendant Centerra, an organization contracted to provide security services to the SRS, to report Plaintiff for harassment. (ECF No. 47-2.) Centerra assigned the matter to Quattlebaum, an investigator with the SRS Law Enforcement Department. *Id.* On January 15, 2013, Quattlebaum met with Ms. Cox at the SRS, and she complained that Plaintiff had been repeatedly sending emails to her at her work email address. *Id.* Ms. Cox explained that she had asked Plaintiff to stop emailing her on several occasions, but he had continued to do so despite her requests. *Id;* (*see also* ECF Nos. 47-5 to 47-8; ECF No. 47-10; ECF No. 47-12; ECF No. 47-13.) Ms. Cox further detailed that she and Plaintiff had been recently divorced pursuant to the Consent Order. (ECF No. 47-2); (*see also* ECF No. 47-3.) Though Plaintiff's use of communication methods outside of Our Family Wizard was not explicitly in violation of the Consent Order, Ms. Cox represented to Quattlebaum that the Consent Order limited Plaintiff's means of communication to Our Family Wizard and that Plaintiff's conduct violated the Consent Order. (ECF No. 47-2 at 4.) Ms. Cox also indicated that Plaintiff harassed

her through means beyond emails.[3] (ECF No. 47-1 at 5.) Ms. Cox provided Quattlebaum with copies of emails containing her requests for Plaintiff to stop emailing her, a copy of an email folder containing emails sent to her by Plaintiff at her SRS email, and a copy of the Consent Order. (ECF No. 47-2 at 3-4, 7.) Lastly, Ms. Cox conveyed that she experienced emotional distress resulting from Plaintiff's actions. (*Id.* at 13-14; ECF No. 47-19 at 3.)

On the same day, Quattlebaum, in his capacity as a law enforcement constable for the SRS, personally appeared before South Carolina Magistrate Judge Patrick D. Sullivan in New Ellenton, Aiken County, South Carolina. (ECF No. 47-21.) Quattlebaum informed Judge Sullivan of his meeting with Ms. Cox and Ms. Cox's attempts to have Plaintiff stop sending emails to her SRS email. *Id.* Quattlebaum also relayed that these emails were causing Ms. Cox emotional distress and that she wanted to press charges against Plaintiff. *Id.* In addition, Quattlebaum provided Judge Sullivan with copies of numerous emails between Plaintiff and Ms. Cox from the interim of March 2012 to January 2013. *Id.* After reviewing the information presented, Judge Sullivan determined that Quattlebaum had provided sufficient evidence to show probable cause and issued an arrest warrant for the magistrate level offense of harassment in the second degree pursuant to S.C. Code Ann. § 16-3-1700 (2005). *Id.*

Later that day, after Judge Sullivan issued the warrant, Quattlebaum telephoned Plaintiff. (ECF No. 47-2 at 3.) Quattlebaum identified himself to Plaintiff and informed Plaintiff of the warrant to which Plaintiff responded that he was on deployment with the U.S. Army and was in the process of boarding a plane to Kuwait. *Id.* Quattlebaum advised Plaintiff to contact him when

---

[3] For example, Ms. Cox indicated that Plaintiff attempted to contact her through text messages, instant messages (IM's), and social media; that Plaintiff filed a "frivolous complaint" against her with the U.S. Army Corps of Engineers; and that Plaintiff repeatedly entered Ms. Cox's property without her permission. (*See* ECF No. 47-20; *but see* ECF No. 48-2 at 161-175.)

3

he returned from deployment to arrange service of the warrant. *Id.* Quattlebaum also informed Plaintiff of the circumstances of the case and advised Plaintiff not to contact Ms. Cox at her SRS email. *Id.*

On January 30, 2013, Centerra released a Uniform Crime Report documenting the existence of the warrant to the U.S. Army. (ECF No. 48-6.) On February 23, 2018, Plaintiff's commanding officer issued a Military Protective Order forbidding Plaintiff from contacting Ms. Cox by any means, other than through Our Family Wizard, until October 1, 2013. (ECF No. 48-16.) During the interim of August 27, 2013 to September 5, 2013, Plaintiff sent seven emails to Ms. Cox at her private email, one of which he also sent to her SRS email.[4] (ECF No. 48-2.) The Magistrate Judge noted in the Report that the contents of these seven emails were not particularly harassing. (*See* ECF No. 54 at 4 n.4; *see also* ECF No. 47-16.)

At some point "on or before February 20, 2013," Quattlebaum had a telephone conversation with David Miller, an assistant solicitor for the Second Judicial Circuit of South Carolina. (ECF No. 47-22.) During that conversation, Quattlebaum conveyed to Miller that Plaintiff had been repeatedly sending Ms. Cox text messages and emails to her SRS email, in disregard of her requests to stop contacting her, and that Plaintiff's actions were causing Ms. Cox mental and emotional distress. *Id.* Based on the information provided, Miller conveyed to Quattlebaum that, in his opinion, Plaintiff's actions constituted harassment in the second degree. *Id.* After this conversation, on February 20, 2013, Quattlebaum followed up with Miller through text message to inquire as to the appropriate charge if he could prove Plaintiff violated a Georgia

---

[4] Three of these emails were the result of using "reply all" to a teacher. (ECF No. 47-16; ECF No. 48-2 at 122-127.) Plaintiff also indicated that the other messages had been sent after he had been transferred to another unit, which caused him to believe that the Protective Order was no longer in effect, and that he ceased contact with Ms. Cox when his superiors instructed him that he still had to comply with the Protective Order. (ECF No. 48-2 at 125-128.)

4

court order. *Id.* Quattlebaum further represented that "it is in [Plaintiff's] divorce paperwork that he is to use a certain program to communicate[,] and he has not used the program." *Id.* at 6. Miller advised that the appropriate charge would be the general sessions offense, rather than the magistrate level offense, when the conduct is in violation of a court order. *Id.*

On February 25, 2013, Quattlebaum again appeared before Judge Sullivan. (ECF No. 47-21 at 3-4.) Quattlebaum reported that he had not yet served the first warrant upon Plaintiff and that he had obtained a written account from Ms. Cox detailing the circumstances of the case, and he informed Judge Sullivan of the "existence of a divorce decree and/or military order of protection." *Id.* Quattlebaum also presented the Consent Order to Judge Sullivan. (ECF No. 47-2 at 12.) Quattlebaum further informed Judge Sullivan of his conversation with Miller. (ECF No. 47-21.) Based on the information provided, Judge Sullivan issued an arrest warrant for the general sessions offense of harassment in the second degree pursuant to S.C. Code Ann. § 16-3-1700 (2005). *Id.* at 3-4, 6.

Plaintiff returned from deployment around September or October of 2013. (ECF No. 47-2 at 6; ECF No. 48-2 at 109.) On February 7, 2014, Plaintiff turned himself in to Sharon Cormier, Quattlebaum's supervisor, at the Aiken County Detention Center. (ECF No. 47-17; ECF No. 48-2 at 165-172.) Cormier and a deputy arrested and booked Plaintiff pursuant to the second warrant for the general sessions offense, and Plaintiff was released on bond later that day. (ECF No. 48-2 at 165-172.) However, because Plaintiff's communications outside of Our Family Wizard were not in violation of the Consent Order, despite Quattlebaum's belief to the contrary, on March 26, 2014, South Carolina Magistrate Judge Melanie Dubose dismissed the charge of harassment in the second degree for lack of probable cause. (*See* ECF No. 47-2.)

Initially, Plaintiff filed this suit in state court, alleging false arrest and other causes of action, on September 29, 2015, and Defendants removed the matter to this court on November 13, 2015. (ECF No. 1-1.) On September 8, 2017, Defendants filed a Motion for Summary Judgment. (ECF No. 47.) On September 25, 2017, Plaintiff filed a Reply in Opposition to Defendants' Motion for Summary Judgment.[5] (ECF No. 48.) After Defendants filed a Reply (ECF No. 52), the Magistrate Judge issued the Report on December 1, 2017, recommending that the court grant Defendants' Motion for Summary Judgment. (ECF No. 54.) Plaintiff filed Objections to the Report on December 28, 2017. (ECF No. 57.) On March 24, 2018, Defendants filed a Reply to Plaintiff's Objections. (ECF No. 68.) Plaintiff's Objections are now before the court.

## II. STANDARD OF REVIEW

**1. Report and Recommendation**

The Magistrate Judge's Report and Recommendation is made in accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02 for the District of South Carolina. The Magistrate Judge only makes a recommendation to this court. *See Mathews v. Weber*, 423 U.S. 261, 270-71 (1976). The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the court. *Id.* The court reviews *de novo* only those portions of the Report and Recommendation to which specific objections are filed. *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005). The court reviews those portions which are not specifically objected to only for clear error. *Id.* at 316. The court may accept, reject, or modify, in

---

[5] In his Reply, Plaintiff only provided arguments regarding his false arrest, malicious prosecution, and supervisory liability claims. (ECF No. 48.) As such, the court presumes that Plaintiff has abandoned the other claims in his Second Amended Complaint, including claims for abuse of process, conspiracy, false imprisonment, intentional infliction of emotional distress, and respondeat superior. (ECF No. 1-1 at 6-11). *See Coker v. Int'l Paper Co.*, No. 2:08–cv–1865–DCN, 2010 WL 1072643, at *2 (D.S.C. Mar. 18, 2010) ("[P]laintiff can abandon claims by failing to address them in response to a summary judgment motion.").

whole or in part, the Magistrate Judge's recommendation or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

## 2. Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

When considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Further, to show that a genuine issue of material fact exists, the non-moving party must set forth facts beyond "[t]he mere existence of a scintilla of evidence." *Id.* at 252. The non-moving party must present evidence sufficient to demonstrate that a reasonable jury could return a verdict for the non-moving party in order to avoid summary judgment. *See id.* at 248.

## 3. South Carolina Harassment Statute

South Carolina law defines harassment in the second degree as follows:

"Harassment in the second degree" means a pattern of intentional, substantial, and unreasonable intrusion into the private life of a targeted person that serves no legitimate purpose and causes the person and would cause a reasonable person in his position to suffer mental or emotional distress. Harassment in the second degree may include, but is not limited to, verbal, written, or electronic contact that is initiated, maintained, or repeated.

7

Mary Lynn's Law, § 7, 2005 S.C. Acts 645, 649-50, S.C. Code Ann. § 16-3-1700 (2005). The penalties for conviction of harassment in the second degree are as follows:

> (A) Except as provided in subsection (B), a person who engages in harassment in the second degree is guilty of a misdemeanor and, upon conviction, must be fined not more than two hundred dollars, imprisoned not more than thirty days, or both.
>
> (B) A person convicted of harassment in the second degree is guilty of a misdemeanor and, upon conviction, must be fined not more than one thousand dollars, imprisoned not more than one year, or both if:
>
> (1) the person has a prior conviction of harassment or stalking within the preceding ten years; or
>
> (2) at the time of the harassment an injunction or restraining order, including a restraining order issued by the family court, was in effect prohibiting the harassment.

*Id.* Regarding the terminology used in the present case, the "magistrate level offense" of harassment in the second degree is a misdemeanor crime, as defined by subsection (A) in the above statute, while the "general sessions level offense" of harassment in the second degree is a more severe misdemeanor crime as defined by subsection (B) of the above statute. *Id.* The only distinguishing factor between the two offenses is that the general sessions offense requires either (1) a prior conviction; or (2) a court order prohibiting the harassment at the time the harassment occurred. *Id.*

### III. DISCUSSION

**1. False Arrest Claim**

In making his false arrest claim, Plaintiff alleges that Defendant Quattlebaum deprived him of his Fourth Amendment rights in seeking and obtaining an arrest warrant for Plaintiff. (ECF No. 1-1 at ¶ 56.) Arrest by a law enforcement officer is reasonable when there is probable cause to believe that a criminal offense has been or is being committed. *Devenpeck v. Alford*, 543 U.S. 146,

152 (2004); *see also* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, *but upon probable cause* . . . .") (emphasis added). Although the existence of probable cause is generally a question of fact, if the evidence supports only one conclusion, summary judgment is appropriate. *Hewitt v. D.P. Garrison*, C/A No. 6:12–3403–TMC, 2013 WL 6654237, at *5 (D.S.C. Dec. 17, 2013). As such, to avoid summary judgment on his false arrest claim, "[Plaintiff] must allege a set of facts which make it unjustifiable for a reasonable officer to conclude [he or she] violated [the law]." *Brown v. Gilmore*, 278 F.3d 362, 368 (4th Cir. 2002). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck*, 543 U.S. at 152. "[An officer's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id.* at 153. Therefore, it is irrelevant whether the arrestee was initially arrested for or charged with an offense for which there was not probable cause, so long as the facts (as known to the officer) are sufficient to find probable cause for another criminal offense. *See id.*

    A. Probable Cause—The General Sessions Level Offense

In support of his false arrest claim, Plaintiff relies primarily upon the fact that the Consent Order did not prohibit Plaintiff from using methods outside of Our Family Wizard to communicate with Ms. Cox. (*See*, *e.g.*, ECF No. 57 at 8.) As a result, Plaintiff contends that his emails were not in violation of any court order. (ECF No. 57; ECF No. 48.)

More specifically, Plaintiff argues that Quattlebaum lacked probable cause for the general sessions offense because no reasonable officer could have concluded that Plaintiff's conduct was in violation of a court order. (*See, e.g.,* ECF No. 57 at 8.) Given that the Consent Order does not

9

explicitly state that Plaintiff could only contact Ms. Cox through Our Family Wizard (*See* ECF No. 47-3 at 3-4), and that Judge Dubose found that law enforcement lacked probable cause because Plaintiff's conduct never violated the Consent Order when she dismissed the general sessions charge against Plaintiff (*See* ECF No. 47-2), the court finds that Quattlebaum lacked probable cause to pursue the warrant and arrest of Plaintiff for the general sessions offense of harassment in the second degree.

However, while Quattlebaum did not have probable cause to arrest Plaintiff for the general sessions level offense, if Plaintiff cannot allege a set of facts that would make it unreasonable for an officer to conclude some other offense had been committed, the court must still dismiss Plaintiff's false arrest claim. *See Devenpeck*, 543 U.S. at 145; *Brown*, 278 F.3d at 368. Although the facts as known to Quattlebaum at the time that he obtained the warrant were not sufficient to show that Plaintiff's behavior was in violation of a court order, this requirement only applies to the general sessions offense, not to the lesser magistrate level offense. *See* S.C. Code Ann. § 16-3-1700 (2005); *supra* Part II.3. As such, to avoid summary judgment on his false arrest claim, Plaintiff must also allege that Quattlebaum lacked probable cause to arrest Plaintiff with respect to the elements of the magistrate level offense of harassment. *See supra* Part II.3. The fact that Plaintiff's conduct did not violate a court order is not sufficient on its own to demonstrate a lack of probable cause. *Cf. id.*

### B. Probable Cause—The Magistrate Level Offense

In *Devenpeck v. Alford*, a state patrol officer initiated a traffic stop on Alford, whom she had reason to suspect had been impersonating a law enforcement officer. 543 U.S. at 148-49. While Devenpeck, the officer's supervisor, was questioning Alford, he noticed that Alford was recording their conversation and had him arrested for violation of the State Privacy Act. *Id.* at 149-50. The

state trial court dismissed this charge. *Id.* at 151. Afterwards, Alford filed suit in federal district court, alleging a false arrest in deprivation of his Fourth Amendment rights pursuant to 42 U.S.C. § 1983. *Id.* The jury found for Devenpeck, the officer. *Id.* The United States Court of Appeals for the Ninth Circuit reversed, finding no evidence to support the jury's verdict. *Id.* In doing so, the Court of Appeals rejected Devenpeck's argument that his arrest was not a deprivation of Alford's Fourth Amendment rights when probable cause existed to arrest Alford for the offense of impersonating a law enforcement officer because this offense was not "closely related to" the offense invoked by Devenpeck during the actual arrest. *Id.* at 152. On appeal, the Supreme Court unanimously reversed and remanded, holding that the arrest was constitutional, so long as there was probable cause to believe that Alford had committed the offense of impersonating a law enforcement officer and thereby rejecting the "closely related offense rule." *Id.* at 154.

The facts of the present case parallel those of *Devenpeck*. Here, Quattlebaum initially obtained a warrant against Plaintiff for the magistrate level harassment offense, but later obtained a new warrant and had Plaintiff arrested for another offense, which Judge Dubose then dismissed in state court. (ECF No. 47-2.) Therefore, the Magistrate Judge was correct in concluding that Plaintiff must demonstrate that there was not probable cause to arrest him on the first offense to avoid summary judgment on his § 1983 claim, regardless of the offense invoked by Defendants in making the arrest or obtaining the warrant. (ECF No. 54.)

In his Objections, Plaintiff argues that there was not probable cause to arrest him for the magistrate level charge in the first warrant.[6] (ECF No. 57 at 5-7.) Plaintiff alleges that no

---

[6] In his Objections, Plaintiff also takes issue with the sequence of facts in this case. (ECF No. 57 at 3-5.) Plaintiff argues that Judge Sullivan issued the first warrant on January 14, 2013, prior to when Quattlebaum met with Ms. Cox on January 15, 2013. *Id.* at 4. In making this claim, Plaintiff cites to the SRS Investigating Officer's Report, which states that "[o]n 01/14/13, Investigator Quattlebaum appeared before Judge Patrick Sullivan and obtained a Warrant for Harassment in

11

reasonable police officer could have believed that Plaintiff's conduct met the element of harassment in the second degree, which requires Plaintiff's conduct to serve no legitimate purpose, because the content of Plaintiff's emails concerned his three minor children. (ECF No. 5-7); *see* S.C. Code Ann. § 16-3-1700 (2005). Plaintiff also argues that no reasonable officer could have believed that Plaintiff's conduct satisfied the element of being an "unreasonable intrusion into the private life" of Ms. Cox because sending emails to another's work email account is not "unreasonable" and is not an "intrusion" where Ms. Cox had the ability to block Plaintiff's emails but did not do so. (ECF No. 57 at 8-9); *see* S.C. Code Ann. § 16-3-1700 (2005). Plaintiff also notes that Ms. Cox initiated emails to Plaintiff using her SRS email account. *Id.*

Although the subject matter of many of Plaintiff's emails did concern his children, the fact that the subject matter of the allegedly harassing communications in question may pertain to a matter of some significance is not sufficient to show that an officer lacked probable cause because he failed to consider that purpose. *See Hewitt*, WL 6654237, at *5 (D.S.C. Dec. 17, 2013) (finding the plaintiff's argument that her harassing emails were related to an impending civil suit between her and the target of the harassment was not sufficient to show that the arresting officer lacked probable cause); *see also Wadkins v. Arnold*, 214 F.3d 535, 541 (4th Cir. 2000) ("Reasonable law enforcement officers are not required to 'exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established.'" (quoting *Torchinsky v.*

---

the 2nd degree for the arrest of [Plaintiff]." (ECF No. 52-1 at 21.) However, the date on this document conflicts with the rest of the evidence in the record, which demonstrates that Quattlebaum instead first met with Judge Sullivan on January 15, 2013. (*See* ECF No. 47-21.) In fact, the signature on the first warrant is dated January 15, 2013. (ECF No. 48-5.) Given this evidence, the only reasonable conclusion is that the date printed on the Investigating Officer's Report was made in error and that Quattlebaum in fact met with Judge Sullivan and obtained the first warrant on January 15, 2013. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of [a] plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for [a] plaintiff.").

*Siwinski*, 942 F.2d 257, 264 (4th Cir. 1991))). Furthermore, the emails on the record do not suggest that Ms. Cox attempted to deny Plaintiff's efforts to communicate about their children, but that she wanted him to do so through Our Family Wizard and not through her work email. (*See*, *e.g.*, ECF No. 47-8.) Also, in contrast to Plaintiff's arguments, some of the emails show that the subject matter of Plaintiff's emails extends beyond a mere concern for his children. (*See*, *e.g.*, ECF No. 47-4; ECF No. 47-6; ECF No. 47-7.)

The court also rejects Plaintiff's argument that there cannot be probable cause for harassment where the target could have taken affirmative steps to block or ignore the harassment. (ECF No. 57 at 8-9.) The text of the harassment statute does not explicitly require that the target must first act to stop the harassment on his or her own. *See* S.C. Code Ann. § 16-3-1700 (2005). The fact that the harassment statute specifically mentions "electronic contact" as an example of harassing conduct goes against Plaintiff's assumption that certain types of communications are exempt from the statute simply because they can be blocked, considering that most electronic communications can be blocked. *See id.* Furthermore, requiring the target of the harassing conduct to first take steps to prevent the conduct conflicts with the purpose of the harassment statute, which is to provide an avenue by which law enforcement may intervene at the earliest manifestations of threatening or intrusive behavior before it can culminate into more severe acts of violence against the target. *See State v. Prince*, 335 S.C. 466, 476 (Ct. App. 1999) ("This state adopted these statutes to protect stalking victims and provide help and intervention before a pattern of harassing conduct results in bodily injury or death.").

Finally, regarding Plaintiff's claim that Ms. Cox instigated some of the email communications to Plaintiff, Plaintiff does not refer to any specific evidence nor does he add any additional evidence to the record in making this claim. (ECF No. 57 at 9.) The emails that Ms. Cox

appears to have initiated from her SRS email are on the record as ECF No. 47-9 through ECF No. 47-13. Each of these emails are requests by Ms. Cox for Plaintiff to cease communicating with her in ways other than through Our Family Wizard. (*See* ECF Nos. 47-9 to 47-13.) The court finds that Ms. Cox's requests for Plaintiff to cease contact do not suggest that Quattlebaum lacked probable cause to find Plaintiff's conduct harassing. If anything, they suggest the opposite. *Cf.* S.C. Code Ann. § 16-3-1700 (2005) ("Harassment in the second degree may include . . . contact that is initiated, *maintained, or repeated.*") (emphasis added).

In sum, according to the record (ECF No. 47-2 at 2-4), Quattlebaum was aware that Ms. Cox had asked Plaintiff to stop emailing her at her SRS email on several occasions, yet Plaintiff was continuing to do so. Ms. Cox indicated that these emails were causing her emotional distress. *Id.* at 13-14. She had also furnished Quattlebaum with copies of emails from both Plaintiff and herself that supported her statements. *Id.* at 2-4. Given this evidence, the court finds that the record in this case can only support the conclusion that when Quattlebaum came before Judge Sullivan on January 15, 2013, he was aware of sufficient facts to show probable cause that Plaintiff's conduct satisfied the magistrate level offense of harassment in the second degree. Therefore, the court dismisses Plaintiff's false arrest claim.

## 2. Malicious Prosecution Claim

To establish a state law claim for malicious prosecution, Plaintiff must show: "(1) the institution or continuation of original judicial proceedings; (2) by or at the instance of [] [D]efendant; (3) termination of such proceedings in Plaintiff's favor; (4) malice in instituting such proceedings; (5) lack of probable cause; and (6) resulting injury or damage." *Law v. S.C. Dep't of Corr.*, 368 S.C. 424, 435 (2006) (quoting *Parrott v. Plowden Motor Co.*, 246 S.C. 318, 321 (1965); *Eaves v. Broad River Elec. Coop., Inc.*, 277 S.C. 475, 477 (1982)). Plaintiff must show a lack of

probable cause to maintain a claim for malicious prosecution, and South Carolina courts have found that "it is permissible to rely on an uncharged offense to establish probable cause" and that this principle applies to malicious prosecution claims. *Jackson v. City of Abbeville*, 623 S.E.2d 656, 669 (S.C. Ct. App. 2005). As such, with respect to probable cause, the legal standard for Plaintiff's malicious prosecution claim is nearly identical to the standard for the false arrest claim in that Plaintiff must allege facts to show that there was no probable cause to arrest Plaintiff for the magistrate level harassment charge. *Cf. Devenpeck*, 543 U.S. at 153. Because the court concluded in the previous section that the evidence does not support a finding that Quattlebaum lacked probable cause for the magistrate level charge, *supra* Part III.1.B, the court also dismisses Plaintiff's malicious prosecution claim.

**3. Qualified Immunity**

In his Objections, Plaintiff challenges the Magistrate Judge's finding that, irrespective of the constitutionality of Plaintiff's arrests, Defendant Quattlebaum is entitled to qualified immunity. (ECF No. 57 at 10-12.) Qualified immunity provides that government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This inquiry is a two-part test: "A court 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'"[7] *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)).

---

[7] The court notes that the Supreme Court does not mandate the order of this two-part inquiry, however, the court chooses to adhere to the order discussed above because "the judges of district courts . . . are in the best position to determine the order of decisionmaking that will best facilitate

The first part of the qualified immunity test assesses whether there has been a deprivation of a constitutional right. *Id.* As concluded by the court in the two previous sections of this opinion, there has not been a constitutional deprivation of Plaintiff's Fourth Amendment rights because Quattlebaum had probable cause to obtain an arrest warrant for Plaintiff. *See supra* Part III.1. As such, "because government officials cannot have known of a right that does not exist," the inquiry ends there. *Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998). However, assuming that there is sufficient evidence of a constitutional violation, the next step in the analysis is to examine whether the right was clearly established. *Wilson*, 526 U.S. at 609. In order for a right to be clearly established, it "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Fourth Circuit has clarified that the second part of the qualified immunity test requires that "the manner in which [the] right applies to the actions of the official must be apparent. Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

In the present case, the mistake which resulted in Judge Dubose dismissing the general sessions charge was Quattlebaum's incorrect belief that the Consent Order limited Plaintiff's means of communication to only Our Family Wizard. (*See* ECF No. 47-2.) However, this part of the qualified immunity test depends not on whether Quattlebaum's interpretation of the order was inaccurate, but on whether his interpretation was *unreasonable. See Harlow*, 457 U.S. at 818. The Fourth Circuit has noted that one of the purposes of qualified immunity is to avoid "the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible

---

the fair and efficient disposition of each case." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Moreover, the Supreme Court recognizes that the above sequence is "often beneficial." *Id.*

[public officials], in the unflinching discharge of their duties.'" *Id.* at 814 (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949), *cert. denied*, 399 U.S. 940 (1950)). A finding that Quattlebaum's mistake was unreasonable would require this court to hold law officers to the same standard as attorneys and judges in interpreting the language of court orders, a standard which would likely dissuade officers from enforcing protective orders or statutes referencing protective orders out of fear that any mistake in interpreting the language of the order will expose them to civil liability. *See id.* at 819 ("But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967))). This "chilling effect" is the very type of situation that qualified immunity seeks to prevent. *See id.* at 814. As such, because this court finds that Quattlebaum's conduct did not "violate clearly established statutory or constitutional rights," Quattlebaum is entitled to qualified immunity. *See id.* at 818.

In his Objection, Plaintiff also argues that Quattlebaum acted unreasonably with regard to the second step of the qualified immunity analysis, alleging that Quattlebaum deliberately mislead Judge Sullivan and also withheld exculpatory evidence by failing to inform Judge Sullivan that he was aware of emails initiated by Plaintiff in pursuing the first warrant. (ECF No. 57 at 11.) However, Judge Sullivan's affidavit states that Quattlebaum "furnished [] copies of numerous email transmissions," of which "[i]n at least two emails Ms. Cox asked or demanded [Plaintiff] to stop contacting her … ," which suggests that Judge Sullivan was aware of the emails initiated by Ms. Cox. (ECF No. 47-21 at 2-3.) Further, as noted previously, the fact that Ms. Cox may have initiated some emails to Plaintiff is not "exculpatory" in and of itself. *See supra* Part III.1.B. Plaintiff alleges that Quattlebaum failed to conduct a full investigation and did not advise Judge

17

Sullivan as such. (ECF No. 57 at 12.) However, "[r]easonable law enforcement officers are not required to 'exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established.'" *Wadkins*, 214 F.3d at 541 (quoting *Torchinsky*, 942 F.2d at 264).

**4. Supervisory Liability**

Plaintiff contests the Magistrate Judge's finding in the Report that Centerra is not liable to Plaintiff under supervisory liability. (ECF No. 57 at 12-15.) For a theory of supervisory liability, Plaintiff must provide evidence that Cormier or another supervisor at Centerra had actual or constructive knowledge that Quattlebaum engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens such as Plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). However, as established in the preceding analysis, Quattlebaum's conduct did not result in a constitutional injury to Plaintiff because Quattlebaum had probable cause for the arrest of Plaintiff. *See supra* Part III.1. Moreover, Quattlebaum's mistake in interpreting the terms of the court order does not amount to conduct that posed an unreasonable risk of a constitutional injury. *See supra* Part III.3. As such, Plaintiff cannot establish a claim for supervisory liability.

## IV. CONCLUSION

For the reasons provided above, Plaintiff Charles Cox has not alleged sufficient facts to demonstrate a violation of his Fourth Amendment rights or malicious prosecution by Jason Quattlebaum or supervisory liability on the part of Centerra Group, LLC. Moreover, Jason Quattlebaum is entitled to qualified immunity. Therefore, the court **ACCEPTS** the Report and Recommendation of the Magistrate Judge (ECF No. 54). Defendants' Motion for Summary Judgment (ECF No. 47) is **GRANTED.**

**IT IS SO ORDERED.**

*J. Michelle Childs*
United States District Judge

August 16, 2018
Columbia, South Carolina